**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JOSEPH SIEGEL, DAVID L. POWELL** | § | |
| **and GENE A. GRANT II,** | § | |
| | § | |
| *Plaintiffs,* | § | **CIVIL ACTION NO. 3:18-cv-01023-N** |
| | § | |
| **VS.** | § | |
| | § | |
| **COMPASS BANK d/b/a BBVA COMPASS,** | § | **Jury Trial Demanded** |
| | § | |
| *Defendant.* | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Joseph Siegel ("Siegel"), David L. Powell ("Powell") and Gene A. Grant II ("Grant") (collectively, "Plaintiffs") file this First Amended Complaint ("Complaint") against Compass Bank d/b/a BBVA Compass or BBVA Compass Bank ("Compass"). In support of their Complaint, Plaintiffs would show the Court as follows:

## I.
### INTRODUCTION

Plaintiffs were members of Compass's senior management until they were terminated under the auspices of cost savings or a reduction-in-force. In reality, Compass was cutting U.S. nationals and older employees in favor of younger Spanish nationals.

Plaintiffs bring this lawsuit ("Lawsuit") against Compass based on Compass's systemic violations of U.S. law's prohibitions against discrimination on the basis of national origin, age, disability, and retaliation. At all relevant times, Compass engaged in an unabashed policy of favoring Spanish nationals over their U.S.-based counterparts, and "retiring" older workers once they turned 50 years old.

Plaintiffs sue to recover their actual damages, including back pay (including lost bonuses, deferred compensation, relocation expenses, and other benefits, etc.), front pay, severe emotional distress and mental anguish, and pain and suffering; 2) compensatory and punitive damages; 3) reasonable attorney's fees and costs of court; and 4) prejudgment interest and post-judgment interest as allowed by law.

## II.
### JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction over this Lawsuit under 28 U.S.C. § 1331 for those claims arising under the Americans with Disability Act, 42 U.S.C. § 12101, *et. seq.* (the "ADA"), Title VII of the Civil Rights Act of 1964, as amended, including 42 U.S.C. § 2000e, *et. seq.* ("Title VII"), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et. seq.* (the "ADEA").

2.      The Court also has diversity jurisdiction over the claims asserted in this Complaint under 28 U.S.C. § 1332, because the matters in controversy exceed the sum or value of $75,000, exclusive of interests and costs, and the suit is between Plaintiffs, who are citizens of the State of Texas, and Compass, a foreign financial institution incorporated in the state of Alabama and with its principle place of business located in Alabama.

3.      The Court has supplemental jurisdiction over the state law claims asserted below under 28 U.S.C. § 1367, because the state law claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy.

4.      Venue is proper under 28 U.S.C. § 1391 because: (a) Compass resides in the Northern District of Texas, pursuant to § 1391(d) and Compass is a corporation subject to personal jurisdiction in the Northern District of Texas by virtue of its business operations in the Northern District of Texas, and (b) a substantial part of the acts and omissions giving rise to this

Lawsuit occurred in the Northern District of Texas and/or Compass does business in the Northern District of Texas.

5.      This Court has personal jurisdiction over Compass because it does business and has substantial contacts in the State of Texas, because each of the Plaintiffs was employed by Compass in the State of Texas, and because the wrongs complained of herein occurred in the State of Texas.

### III.
### PARTIES

6.      Plaintiff Siegel resides in Dallas, Texas. Siegel was previously employed by Compass in Dallas, Texas.

7.      Plaintiff Powell resides in Houston, Texas. Powell was previously employed by Compass.

8.      Plaintiff Grant resides in Houston, Texas. Grant was previously employed by Compass.

9.      Compass is a foreign financial institution doing business in the State of Texas. Compass may be served through its registered agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

### IV.
### EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.     Plaintiffs each timely filed a charge of discrimination against Compass with the U.S. Equal Employment Opportunity Commission ("EEOC"). Plaintiffs are filing this Complaint within 90 days after receiving their respective notices of rights to sue from the EEOC.

11.     Plaintiff Powell filed an EEOC charge on July 7, 2017. Powell received his notice of right to sue letter from the EEOC on February 13, 2018.

12.     Plaintiff Grant filed an EEOC charge on July 7, 2017. Grant received his notice of right to sue letter from the EEOC on February 22, 2018.

13.     Plaintiff Siegel filed an EEOC charge on July 11, 2017. Powell received his notice of right to sue letter from the EEOC on January 23, 2018.

## V.
### FACTS

A.     ***Compass engages in a widespread, systematic discrimination against U.S. nationals and employees over 50 years old.***

14.     There is a long history and continuing pattern of discrimination based upon national origin and age at Compass and its various parents, affiliates, subsidiaries, and divisions.

15.     Compass is a subsidiary of Banco Bilbao Vizcaya Argentaria, S.A., which is headquartered in Spain ("BBVA Spain"). Compass has managerial, supervisory and regulatory oversight responsibility for the BBVA New York Branch, and as a matter of policy, its day-to-day operations report into Compass management. BBVA Spain maintains an offshore legal entity in the Cayman Islands; this entity, as a matter of policy, falls under the managerial, supervisory, and regulatory oversight responsibility of the BBVA New York Branch. All of these entities are considered part of BBVA Spain's US operations, and all report directly to Compass.

16.     U.S. banking laws and regulators require a bank's CEO and executive management committee to supervise all banking activities.

17.     This is designed to ensure compliance with U.S. law and banking regulations.

18.     However, a small group of managers at BBVA Spain has historically bypassed the authority of the CEO and Compass's executive management committee for their own personal gain and to benefit Spanish nationals at the expense of their U.S. counterparts at Compass.

19.     These managers control the global corporate and investment banking operations of Compass, and other bank operations in the U.S., including compliance and legal, and are part of BBVA Spain's global management committees ("Global Management").

20.     At all relevant times, Global Management controlled all decisions regarding hiring, firing, promotions, raises, and compensation in the U.S.

21.     Global Management also dictated all tactical decisions, such as business plans for each individual U.S. client, regulatory responses, and compliance activities.

22.     As a result, attempts by Compass's CEO and other senior managers to supervise and enforce Compass's adherence to U.S. regulation, bank policy, and best business practices were frequently thwarted and/or completely ignored by Global Management.

23.     Global Management threatened retaliation against Compass's senior managers to override their management oversight.

24.     As a result, discriminatory policies and retaliation instigated in Spain were implemented at Compass against U.S. nationals.

25.     Global Management also assured the success of its discriminatory policies by making sure Compass's CEO and a certain number of his direct reports were Spanish nationals.

26.     Compass's senior management, and particularly its Spanish CEO, understood that their bonuses and careers depended on maintaining a position of good standing with BBVA Spain and Global Management.

27.     Most, if not all, of these Spanish senior managers at Compass planned to return to live and work in Spain once their tenure in the U.S. had finished.

28.     If they supported Global Management, it was understood that they would be rewarded with well-paying jobs and senior manager roles with BBVA Spain when they returned to Spain.

29.     Yet, if they opposed Global Management's plans, they would have no such future, and instead would be retaliated against and would likely be terminated.

30.     Because BBVA Spain dictated the terms of Compass's senior managers' bonuses and long-term job security, Spanish nationals working at Compass granted Global Management carte blanche to push discriminatory and illegal practices into the U.S.

31.     Over time, Global Management created a compensation system for managing Compass and its support areas that allowed it to arbitrarily set bonuses and compensation, and to move employees in and out of jobs in favor Spanish nationals over U.S. nationals. The system was purposefully designed to circumvent U.S. regulation.

32.     For example, during 2015 and 2016, BBVA Spain CEO Carlos Torres demanded that his direct reports implement important cost reductions, achieved largely through employee terminations.

33.     To implement these "cost reductions," Global Management started with and targeted Compass U.S. nationals by compiling a list of candidates for termination. These terminations were conducted under the auspices of being a "reduction-in-force" ("RIF"). Notably, BBVA New York Branch (which operates under the supervision of Compass), was also included in the RIF.

34.     Global Management had every incentive to focus its terminations on U.S. nationals, because for every U.S. national Global Management terminated, a Spanish national in Spain could remained employed.

35.     Elimination of U.S. nationals at Compass also created strong incentives to import Spanish national to the U.S. to fill Compass positions recently vacated by U.S. nationals.

36.     In addition to creating a termination policy favoring Spanish nationals, these policies also favored younger, less experienced employees.

37.     The instances of Spanish nationals: (a) being sent to the U.S. to take jobs for which they were not qualified; (b) being moved to other positions to protect them from position elimination; and (c) being provided more favorable compensation, terms and conditions of employment and severance, are too numerous to count.

38.     Compass also carried over BBVA Spain's policy of "retiring" managers at or near 50 years of age.

39.     Spanish nationals regularly and publically stated that an employee's career was close to over once that employee turned 50 years old.

40.     During the 2016 RIF, Compass terminated 41 employees.

41.     Global Management identified those individuals to be terminated.

42.     At that time, Compass employed numerous Spanish nationals.

43.     However, out of 41 terminations, not a single Spanish national was terminated in the 2016 RIF.

44.     Two Spanish nationals were on the final cut list; but they were removed from the list just before the RIF announcement.

45.     Moreover, a significant number of Spanish nationals were transferred back to Spain so that they would not be terminated.

46.     At the time of the 2016 RIF, Compass's Corporate & Investment Banking executive management committee was comprised of 18 voting members: 12 non-Spanish members and six Spanish nationals.

47.     Notably, six of the 12 non-Spanish nationals were terminated during 2016, including Plaintiff Powell. Conversely, no Spanish national was terminated from the Corporate & Investment Banking executive management committee.

48.     Among Compass's senior management, it was widely recognized that exporting jobs from the U.S. to Spain did not cut costs or financially benefit Compass. It did, however, allow Spanish nationals to keep their employment at the expense of U.S. nationals.

**B.      *Compass terminates Plaintiff David L. Powell for discriminatory reasons.***

49.     Powell was the Co-Head of the U.S. Corporate & Investment Bank at Compass Bank when he was terminated officially on October 31, 2016.

50.     Powell was told that he was being terminated as part of an alleged restructuring of Compass's U.S. Corporate & Investment Bank.

51.     The restructuring included a RIF implemented during September and October 2016.

52.     Powell voiced his concern on numerous occasions that illegal discriminatory factors (age, national origin, retaliation) pushed into the U.S. from the bank's home office in Spain were driving the decision under which bank employees were to be terminated.

53.     Prior to the restructuring and RIF, Powell had also opposed other bank decisions that illegally favored Spanish nationals at the expense of U.S. nationals and the bank's well-being.

54.     At different times, Powell had been warned by various Spanish nationals to stand down from such opposition for his "own good."

55.     Powell was asked by his direct supervisors, both of whom were Spanish nationals, to support the implementation of the RIF.

56.     This included the delivery of termination notices to many team members, including employees in Houston, Dallas and the New York, and then later sitting at the front of the meeting where the restructuring was explained and presented to the remaining employees.

57.     After doing so, Powell was also eliminated based on his national origin, age, and medical disability and in retaliation for opposing illegal and discriminatory practices.

58.     Powell had been employed by Compass and its affiliates for almost 25 years.

59.     During many of those years, Powell was among the highest-ranking U.S. national within the ranks of BBVA Spain's Global Management.

60.     Powell had a "front row" seat as a member of both the Compass Executive Management Committee and the Global Corporate & Investment Bank Executive Management Committee seated in Spain, where he witnessed and came to know BBVA Spain's deep-rooted discriminatory culture and practices.

61.     Powell's last job at the bank was as one of two managers jointly responsible for the U.S. Corporate & Investment Bank.

62.     Powell's responsibilities included managing and providing oversight to the corporate and investment banking activities of Compass, BBVA New York Branch, and BSI Securities, Inc.

63.     In this role, Powell reported locally to Compass's then-CEO and U.S. Country Manager, Manolo Sanchez, and was member of the Compass Executive Management Committee.

64.     In reality, Powell's direct supervisors were Alvaro Aresti and Juan Asua, both Spanish nationals and members of Global Management in Spain.

65.     Internal organizational charts confirm this dual-reporting structure.

66.     While employed by Compass, Powell witnessed numerous instances how Aresti and Asua, among other members of Global Management micromanaged Compass and its support areas, often favoring and protecting Spanish nationals to the detriment of U.S. nationals without merit or justification.

67.     When Powell voiced his concerns regarding issues of discrimination or other potentially illegal practices, Powell was ignored.

68.     Powell's active opposition ultimately led to a hostile environment and retaliation, and contributed to Powell's termination.

69.     During the several years before Powell's termination, various Spanish national colleagues congratulated him on his "survival" and joked that Human Resources would soon be coming for him.

70.     During the 2016 RIF, Powell repeatedly raised concerns of national origin discrimination and age discrimination regarding the restructuring and RIF process to Powell's direct supervisors and other senior managers, both in the U.S. and in Spain.

71.     Each time, Powell was told that these issues were being addressed and/or that Powell should drop it.

72.     During the RIF, Powell also witnessed jobs being "offshored" from the U.S. to Spain, to preserve employment for Spanish nationals by sending them back to Spain.

73.     Powell was also told that his raising of concerns made him "untrusted."

74.     Powell has also been the subject of harassment tactics designed to force him to accept an unfair severance proposal.

75.     As a result of Compass's actions above, Powell suffered at least the following injuries: (a) the loss of his job and all associated monetary and non-monetary benefits; (b) loss of future income, including benefit accumulation; (c) loss of deferred compensation related to work done for years prior to 2016; (d) loss of the early retirement benefits; (e) absence of any severance benefits; (f) loss of Powell's 2016 bonus; (g) loss on relocation/sale of home; and (h) pain, suffering, and mental anguish.

76.     During his long career with Compass and its various affiliates, Powell saw Compass "early retire" numerous employees. In Spanish, this is called being "*prejubilado*," which translates to early retirement.

77.     Powell communicated that if he was terminated in the RIF, he expected a severance package that included medical insurance.

78.     It was only within days of Powell's termination that he was told he was being terminated without medical insurance or a fair severance payment, and not "early retired."

79.     This news was particularly concerning given the high expense of treating Powell's diabetes.

80.     Powell was also warned that he should accept whatever was being offered or there would be negative consequences.

81.     Powell later discovered that Compass had canceled his deferred compensation program, a benefit valued in the hundreds of thousands of dollars.

82.     Powell's direct supervisor, Alvaro Aresti, told him that after the RIF, Powell was to be terminated with the decision being based on his age and that it was "[his] turn."

83.     Upon information and belief, Powell was terminated instead of his Co-Head of Corporate & Investment Bank, Juan Pablo Jimeno, based on age and because Jimeno was a Spanish national.

84.     Powell was 54 years old when terminated. Jimeno, a well-connected Spanish national, was an estimated 49 years of age.

85.     A significant number of senior managers that reported directly to Powell and Jimeno were also terminated: Kerri Fox; Gene Grant; Kristen Holm; Jim Recer; and Plaintiff Siegel.

86.     All were U.S. nationals, most of whom where over 50 years of age at the time of their termination.

C.      *Gene A. Grant II is a victim of Compass's illegal discriminatory practices.*

87.     Plaintiff Grant was terminated on October 1, 2016 during the 2016 RIF.

88.     At the time of his termination, Grant was serving as the Global Head of Business Evolution Group, Global Markets, working within Corporate & Investment Bank for Compass.

89.     Grant was targeted for elimination based upon his age, national origin, and in retaliation for opposing illegal and discriminatory practices.

90.     Grant's 27-year career had spanned managing business lines, technology management, trading, client-facing sales activities, and large-scale program management, and he has a thorough knowledge of regulatory, legal, systems and processes, etc.

91.     Grant began working for BBVA Spain in 2011, but he was moved to the U.S. in 2014. Grant agreed to relocate back to the U.S. based upon promises that he would be given the title of Chief Operating Officer of Corporate & Investment Banking U.S.A.

92.     However, Grant was told that his promotion was blocked by Ricardo Laiseca because Laiseca wanted "his guy" from Spain, Emiliano Salcines, to remain in the role, despite widespread frustration with his performance and competence.

93.     Grant performed most of the functions of the role without the official title, rewards or recognition.

94.     Grant was further told that the alternate title he deserved based on his responsibilities, Deputy Head of Global Markets U.S.A., was blocked by Antonio Ordas.

95.     In 2016, the group reorganized, and the COO role was eliminated, but the functions were split between a new role, Head of U.S. [Corporate & Investment Bank] Engineering U.S.A. ("CIB Engineering") and the co-heads of U.S. Corporate & Investment Bank.

96.     Grant continued in his role to oversee all the previous COO functions on behalf of the business—including the engineering department, but the title of Head of CIB Engineering went to Alberto Repiso, a Spanish national.

97.     While in the U.S., the environment that Grant worked in was openly hostile to non-Spaniards.

98.     Often Grant was excluded from conversations and discussions in the office—both in meetings and in informal settings—which were held in Spanish.

99.     The Spanish nationals routinely held discussions in Spanish in the presence of non-Spanish speakers, and in so doing, made the non-Spanish speakers feel extremely uncomfortable and excluded.

100.    This was very prevalent, and Grant was retaliated against for complaining about the strong negative effect of such behaviors.

101.    Similarly, the Spanish nationals would communicate amongst themselves and exclude non-Spanish from discussions.

102.    Grant complained about such exclusionary behavior not only because it prevented him from receiving the benefit of having all of the knowledge he needed to perform his duties, but also the Spanish were not always familiar with the U.S. (both business and regulatory) and consequently made certain decisions that were not always in the best interest of Compass.

103.    Because of the discrimination, harassment, and retaliation to which Grant was subjected, he suffered, and continues to suffer, loss of income and benefits, loss of additional compensation such as incentive, and pain and suffering.

104.    Grant was also aware of a trend to "retire" managers once they were in or near their 50s.

105.    In particular, Grant repeatedly raised concerns of national origin discrimination and age discrimination with regard to "Project Alamo."

106.    When this project was first proposed, Grant objected on a number of grounds—including financial, customer service, offshoring of positions that should remain within the U.S. and the ability of employees based in Spain to meet the same employment requirements as those in the U.S. (including fingerprinting and drug-testing)—and when the idea was pushed a second time, Grant was specifically excluded from the project group.

107.    Grant was privy to conversations specifically about elimination of long-term employees in Birmingham, Alabama in favor of people in Spain.

108.    Within the technology department, support and development roles for the Summit vendor system were removed from employees in the U.S. and transferred to employees of vendors in Spain.

109.     Moreover, Grant was repeated told to "not keep making noise" about certain people obtaining access to material non-public information who did not have the proper licenses and credentials to again access to such information. As a result of Grant's complaints, Compass undoubtedly retaliated against him.

110.     Grant suffered the following damages as a result of BBVA's actions: (a) loss of Grant's job and all associated monetary and non-monetary benefits; (b) loss of future income, including benefit accumulation; (c) unfitting and incorrectly calculated severance; (d) loss of portions of his 2016 bonus; (e) lost wages; and (f) pain and suffering, and mental anguish.

**D.     *Compass illegally discriminates against Joseph Siegel under the auspices of a RIF.***

111.     On October 1, 2016, Siegel was terminated from Compass.

112.     Siegel's termination was part of the 2016 RIF implemented by Compass, supposedly as an attempt to reduce costs.

113.     Siegel's termination coincided with the termination of a significant number of other Compass employees who were U.S. citizens, and most of whom were over the age of 40.

114.     Based on the facts below, Siegel's termination was the result of discrimination and retaliation based on Siegel's national origin and age.

115.     As a result of Compass's discrimination and retaliatory termination, Siegel has suffered various damages, including without limitation: (1) loss of monetary and non-monetary benefits; (2) loss of future income, including benefit accumulation; (3) loss of contractual severance benefits; (4) loss of full 2016 bonus; (5) lost wages; and (6) pain and suffering and mental anguish.

116.     Siegel had 25 years of experience in syndicated, leverage finance and corporate lending. Compass, which prior to Siegel's hiring had limited U.S. corporate lending or syndicated

finance presence, lured Siegel away from his position at Merrill Lynch to help Compass enter these banking areas.

117.    During Siegel's tenure at Compass, Siegel organized, developed, and then led a corporate lending and syndicated finance businesses and instituted nationwide.

118.    These groups experienced solid year-over-year performance, including the doubling of net syndicated fee revenue and a 28% increase in 2016 revenue over 2015 revenue.

119.    From all accounts, Siegel's work at Compass was not only of the highest quality, but also very lucrative to Compass.

120.    On September 14, 2016, Plaintiff Powell and Maria Gomez informed Siegel of his termination.

121.    They told Siegel that his position was being "eliminated" as part of a RIF involving many Compass employees.

122.    In reality, Siegel's position was not eliminated, but transferred to Philip Schubert ("Schubert"), who previously served as Compass's Head of U.S. Debt Capital Markets.

123.    Notably, Schubert has no previous professional experience in syndicated finance and corporate lending.

124.    Schubert's prior responsibilities and reports were transferred to other individuals.

125.    Schubert's new role consisted of taking over Siegel's prior responsibilities and team.

126.    Spanish executives excluded Siegel from conversations and discussions that he otherwise should have been a part of based on his duties and responsibilities.

127.    The Spanish nationals routinely held discussions in Spanish in the presence of non-Spanish speakers, and in so doing, made the non-Spanish speakers feel extremely uncomfortable and excluded.

128.    Similarly, the Spanish nationals would communicate amongst themselves, and exclude non-Spanish from discussions.

129.    Siegel was terminated to protect Spanish national employees who were regularly "exported" to the U.S. even though they had no relevant experience.

130.    Notably, virtually no Spaniard within Compass was terminated in the late 2016 RIFs.

131.    Compass's management and hierarchy favor those of Spanish origin and those whose native language is Spanish, regardless of experience, work ethic, or experience.

132.    Generational ties, Spanish aristocracy, and familiarity drive decisions relating to who to promote and terminate.

133.    As a result, at best, Spaniard employee incompetence and mediocrity went unaddressed.

134.    At worst, underperforming Spaniards were exported to the U.S. or placed in "soft" positions where they could work until retirement without fear of termination.

135.    U.S. nationals are not given such treatment regardless of their performance.

136.    During Siegel's tenure at Compass, he witnessed numerous instances of: (a) Spanish nationals replacing U.S. nationals in jobs for which they were not qualified, (b) Spanish nationals being moved to positions as a means of protecting their employment at Compass, and (c) Spanish nationals receiving more favorable compensation, terms, and conditions of employment, and severance than their U.S. national counterparts.

137.    Indeed, despite Siegel's experience of over 25 years with Bank of America, Merrill Lynch, and others, he was passed over for several roles that went to Spaniards or Spanish-speaking individuals.

138.    Spanish traditions and customs allow an employer to terminate an employee based on age.

139.    In Spanish culture and at Compass, this was known as "being retired."

140.    Individuals older than 50 are frequently "retired" in Spain.

141.    Indeed, other than the elderly chairperson of Compass, its management team is predominantly below age 55.

142.    Culturally, the notion of being put "out to pasture" is commonly practiced and culturally accepted due to BBVA Spain's pension plan and severance programs available to Spanish nationals.

143.    As a result, Compass's corporate culture does not respect U.S. law and the protections granted to employees.

144.    Siegel personally observed Compass' informal policy of "retiring" U.S. nationals who were older than 50.

145.    Siegel also witnessed preferential treatment given to younger employees over more experienced but older employees.

146.    The RIF list shows that most of the positions identified in the RIF were held by employees older than 40.

147.    As for Siegel's termination—he was 59 years old; his replacement was 46.

148.    BBVA Spain often directed Siegel to take actions and use his authority in ways that he considered to be in direct violation of U.S. banking regulations and inconsistent with Compass's governance policies.

149.    BBVA Spain also repeatedly sought to interfere with Compass's autonomy and sought to supplant Compass senior management decisions without authority.

150.    Siegel was repeatedly pressured by BBVA Spain, and was frequently concerned and aware that his refusal came with a high price.

151.    Spanish nationals were not asked to perform actions that violated U.S. laws.

152.    Siegel's refusal to comply with BBVA Spain's improper directives resulted in further discrimination against Siegel by BBVA Spain's leadership, and made it that much easier for them to terminate Siegel.

153.    After termination, Compass also denied Siegel certain benefits for which he had specifically negotiated, or to which he was entitled as an employee of Compass.

154.    For example, Compass's termination letter sidestepped its agreement with Siegel relating to severance that vested when Siegel accepted his offer with Compass.

155.    The offer letter provided for a minimum of 52 weeks of severance

156.    The termination letter provides only 34 weeks of severance

157.    Moreover, Siegel's salary (as calculated in the termination letter) artificially depressed the amount to which Siegel was entitled, by omitting from Compass's calculation certain supplemental compensation, known at Compass as "*complemento*," or "supplemental pay."

158.    Compass uses *complemento* to skirt European-banking regulations relating to executive pay.

159.     These payments are a part of the annualized salary of highly compensated individuals.

160.     Siegel was also entitled to an annual bonus of up to 150% of his target incentive for 2016, which he did not receive.

161.     Siegel suffered the following damages as a result of Compass' actions: (a) loss of his job and all associated monetary and non-monetary benefits; (b) loss of future income, including benefit accumulation; (c) unfitting severance; (d) loss of deferred compensation related to work done for years prior to 2016; (e) loss of full 2016 bonus; (f) lost wages; and (g) pain and suffering, and mental anguish. These damages include back pay, 52 weeks of severance based on his annualized salary including the *complemento*, benefits, lost profits, and future earnings for the maximum allowable time period, lost/improperly calculated bonuses, deferred compensation, front pay, attorney's fees, costs, and interest.

## VI.
### CAUSES OF ACTION

### COUNT ONE: Violations of Title VII

162.     Plaintiffs re-allege paragraphs 1 through 161 as though fully set forth herein.

163.     Whenever in this Complaint it is alleged that the Compass did any act or thing, it is meant that the Compass's officers, agents, servants, employees or representatives did such act and/or that at that time such act was done, it was done with the full authorization or ratification of Compass or was done in the normal and routine course and scope of employment of Compass's officers, agents, servants, employees, or representatives.

164.     Compass violated Title VII by discriminating against Plaintiffs with respect to their compensation terms, conditions, or privileges of employment on the basis of national origin.

165.    Compass violated Title VII by limiting, segregating, or classifying Plaintiffs in a way that deprived or tended to deprive them of employment opportunities or adversely affected their status as employees because of their national origin.

166.    Compass violated Title VII by impermissibly considering national origin in its employment practices.

167.    Compass violated Title VII by discriminating against Plaintiffs as a result of their opposing and reporting practices that were unlawful employment practices under Title VII.

168.    Such unlawful discrimination, retailiation, and employment practices have caused Plaintiffs to suffer damages, including, without limitation, loss of back pay and past wages, interest on back pay, future pecuniary losses and loss of future earnings, damages to his personal and professional reputation, and damages for emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life.

**COUNT TWO: Violations of the Age Discrimination in Employment Act of 1967**

169.    Plaintiffs re-allege paragraphs 1 through 168 as though fully set forth herein.

170.    Each of the Plaintiffs is at least 40 years of age. Compass violated the Age Discrimination in Employment Act of 1967 (the "ADEA") by discriminating against Plaintiffs with respect to their compensation, terms, conditions, or privileges of employment, because of their ages.

171.    Compass violated the ADEA by limiting, segregating, or classifying Plaintiffs in a way that deprived or tended to deprive them of opportunities and or otherwise adversely affected their status as employees, because of their ages.

172.    Compass violated the ADEA by discriminating against Plaintiffs because they opposed the unlawful practices described above that are made unlawful by the ADEA.

173.    Such unlawful discrimination and employment practices have caused Plaintiff to suffer damages, including, without limitation, loss of back pay and past wages, interest on back pay, future pecuniary losses and loss of future earnings, damages to his personal and professional reputation, and damages for emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life.

### COUNT THREE: Violations of the Americans with Disabilities Act of 1990

174.    Plaintiffs re-allege paragraphs 1 through 173 as though fully set forth herein.

175.    Powell suffers from diabetes, a life-long illness that requires expensive medical treatment.

176.    Compass had knowledge of Powell's condition and the expense associated with treating such condition.

177.    Powell was told that he was being terminated without medical insurance or a fair severance payment and not being "early retired."

178.    Powell was given no explanation for why, as an employee with a stellar performance record, he was being terminated instead of separated as part of a RIF, other than that he should accept whatever was being offered or there would be negative consequences.

179.    A contributing factor to Powell's termination and refusal medical insurance was his diabetes and an attempt to avoid the expense.

180.    As shown above, Compass violated the ADA by discriminating against Powell in connection with his discharge and the terms conditions and privileges of such discharge.

### COUNT FOUR: Retaliation for Refusal to Commit Illegal Acts

181.    Plaintiffs re-allege paragraphs 1 through 180 as though fully set forth herein.

182.    In the alternative, Siegel was terminated for the sole reason that he refused to commit an unlawful act. *Sabine Pilot Service, Inc. v. Hauck*, 687, S.W.2d 733 (1985). As a result, Siegel has suffered actual damages that include (1) past lost wages and benefits, (2) future lost wages and benefits, and (3) damages for mental anguish. Siegel also sues for punitive damages, prejudgment interest, and court costs.

## COUNT FIVE: Breach of Contract

183.    Plaintiffs re-allege paragraphs 1 through 182 as though fully set forth herein.

184.    Plaintiffs and Compass had enforceable agreements under which Compass agreed to provide Plaintiffs with certain benefits, including bonuses, severance, medical benefits, and other monetary consideration.

185.    Compass breached the agreement by failing and/or refusing to pay such benefits as agreed.

186.    As a result of Compass's breach of such agreements, Plaintiffs have suffered injury, including but not limited to: (a) their actual damages; (b) attorney's fees; (c) costs of court; and (d) pre- and post-judgment interest.

## COUNT SIX: Quantum Meruit

187.    Plaintiffs re-allege paragraphs 1 through 186 as though fully set forth herein.

188.    In the alternative, Siegel sues in quantum meruit for the value of the services he provided to Compass.

189.    Specifically, Siegel provided valuable services to Compass in the form of employment.

190.    The services were provided for Compass.

191.    Compass accepted the benefits associated with Siegel's employment and the value generated by the services.

192.    Compass had reasonable notice the Siegel expected his compensation for the services and materials.

193.    As a result of Compass's acceptance of these services and its failure to pay Siegel for these services, Siegel has been damaged.

194.    Siegel sues for the value of his 52 weeks of severance, the full and complete value of his employment, and the value of any bonus that he did not receive, but that Compass expected to pay to Siegel as a result of his services.

## VII.
## EXEMPLARY DAMAGES

195.    The actions of Compass as described above, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of the harm that would be inflicted upon Plaintiffs. Because of said conduct, Plaintiffs are entitled to exemplary/punitive damages in an amount sufficient to punish Compass and to deter others from like conduct.

## VIII.
## REQUEST FOR ATTORNEY'S FEES

196.    Plaintiffs were forced to hire attorneys to represent them in this Lawsuit, and as a result, they should be awarded reasonable attorney's fees under the applicable statutory provisions under which they sue.

## IX.
## DEMAND FOR JURY TRIAL

197.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues to be tried in this matter.

## X.
### PRAYER FOR RELIEF

For all the above reasons, Plaintiffs Powell, Grant, and Siegel respectfully request that the Court cite Defendant Compass Bank d/b/a BBVA Compass or BBVA Compass Bank to appear, and upon trial of this matter, the Court enter a judgment awarding Plaintiffs:

1.  Actual damages, including back pay (including lost bonuses, deferred compensation, relocation expenses, and other benefits, etc.), front pay, severe emotional distress and mental anguish, pain and suffering;

2.  Compensatory and punitive damages;

3.  Reasonable attorney's fees and costs of court;

4.  Prejudgment interest and post-judgment interest as allowed by law; and

5.  Such other and further relief as this Court deems just and proper.

Respectfully submitted,

HALLETT & PERRIN, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas 75202
(o) 214.953.0053
(f) 214.922.4142

By:    *Monte K. Hurst*

Monte K. Hurst
State Bar No. 00796802
Monte.Hurst@hallettperrin.com

Bryan P. Stevens
State Bar No. 24051387
BStevens@hallettperrin.com

*Counsel for Plaintiffs David L. Powell,
Gene A. Grant II and Joseph Siegel*

## <u>CERTIFICATE OF SERVICE</u>

On May 14, 2018, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I have served the following counsel, as follows, electronically or by another manner authorized by Rule 5(b)(2) of the Federal Rules of Civil Procedure:

Michael R. Buchanan
Ogletree Deakins
Preston Commons West
8117 Preston Road, Suite 500
Dallas, TX, 75225
mike.buchanan@ogletree.com

*Monte K. Hurst*
Monte K. Hurst